

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| BENJAMIN JEROME PRINCE, | § | No. 08-12-00290-CR |
| Appellant, | § | Appeal from the |
| v. | § | 30th District Court |
| | § | |
| THE STATE OF TEXAS, | § | of Wichita County, Texas |
| | § | |
| Appellee. | § | (TC# 52,059-A) |
| | § | |

## **O P I N I O N**

Benjamin Jerome Prince, Appellant, appeals his conviction of capital murder of a person

under six years of age.   TEX.PENALCODE ANN. §  19.03(a)(8)(West 2011). [1]   Appellant was

assessed punishment of life without possibility of parole.   We affirm.

## **BACKGROUND**

Nicole Grant testified that she was the mother of two children when she met Appellant,

Benjamin Prince, and she began dating him in about 2002 or 2003.   Nicole and Appellant

subsequently lived together in a common law marriage and on September 22, 2007, they had a

baby, Trebien Grant Prince.   Approximately ten months later, Appellant had a baby by another

---

[1] The Legislature has since raised the age of the child victim for this offense to "under 10 years of age."   *See* TEX.
PENAL CODE ANN. § 19.03(a)(8)(West 2011).

woman, Scheron Greene. Although angered and upset, Nicole forgave Appellant and they continued to live together even though they fought often and she had "kicked him out" a few times. In the spring or summer of 2009, Appellant told Nicole that he had again impregnated Scheron Greene, and the baby was born in December 2009. Nicole and Appellant separated, but Nicole eventually allowed Appellant to return. They lived in a house with their son Trebien, Nicole's two older sons, and John Prince, Jr. who was Nicole's adult stepbrother and Appellant's cousin.

On August 29, 2009, Nicole, Appellant, and the three boys returned home after visiting Appellant's brother. John was in the living room watching TV and talking on the phone. Nicole sat in the living room and talked with John after the boys were in bed. Appellant came into the living room then went to the kitchen. Nicole testified that they had been drinking that day, but no one was "falling down drunk." Nicole said that an argument started when Appellant told John that he did not even like his family.[2] John told Appellant that he used to look up to him, but after he saw how Appellant was treating Nicole, he decided Appellant was nothing but a punk. Appellant then got "in [John's] face," and argued with him. When Nicole tried to pull Appellant off John, Appellant pushed her into John, causing them to fall into the sliding glass door. A scuffle ensued and Nicole and John fell on Appellant. Nicole hit Appellant and punched him in the head. Nicole later told John and Appellant to quit fighting and just cool off.

After they stopped fighting, John sat down in a chair and Nicole went back to her beer and the couch. Appellant stood in front of the fireplace, then went to the icebox and got two beers, opening one. Nicole recalled saying that they should all sit and watch television. Appellant replied, "[N]o, we'll see when I come back." Appellant then went outside and Nicole and John thought Appellant was getting into a vehicle and leaving the house.

---

[2] It is unclear whether "he" and "his" family refer to John or to Appellant.

2

After Appellant went outside, John told Nicole that she should leave Appellant because he was not treating her right. John advised Nicole that she should make Appellant "stay gone" and not take him back. Nicole did not hear a vehicle start and was uncertain but thought she heard the screen door while she and John were talking. Appellant eventually came back in, and when he asked John and Nicole what they were discussing, they told him they had been talking about something on the television. Nicole noticed that Appellant's pocket looked bigger. Then Appellant said, "[W]hy didn't you believe me[?]" and Nicole heard a pop. She looked down and saw blood coming out of her shirt on the left shoulder. Nicole screamed, got down behind a green chair and dialed 9-1-1 on her flip-type cell phone. Nicole knew John was sitting in the green chair, but she did not know what happened next. She heard one shot, followed by silence. Nicole had run to the kitchen and down the hall to get Trebien before she heard the next shot. She remembered that her cell phone was under the chair. She did not see John and did not know where Appellant had gone.

Nicole got Trebien out of his bed and went to the other boys' room and woke them, but they were sleepy and just sat there. Appellant came in and jerked Trebien off the bed. While sitting on the floor, Nicole saw Appellant begin beating Trebien in the head with a gun held sideways. Appellant lost the gun and started yelling, "where's it at, where's it at?" Appellant's hands were slippery and he could not find the gun but continued yelling, "where [is] it[?]" Nicole thought Appellant's hands were slippery with Trebien's blood. Appellant then picked Trebien up and went to the kitchen. A few minutes later Appellant returned to the bedroom with a hammer in one hand and Trebien in the other. Appellant began beating Trebien in the head with the claw part of the hammer. Nicole said that at that point she could not walk and could barely crawl.

3

Appellant eventually stepped over Trebien. Nicole lay down over Trebien, then picked him up and ran to the sliding door, but it was locked. As Nicole sat in front of the glass door holding Trebien, Appellant came into the living room and said, "[L]ook what you made me do" or "look what you did."

Appellant came back down the hall and pointed the gun at Nicole. Nicole thought Appellant tried to shoot her but the gun was empty. Appellant then said, "Nicole, it's your fault, this is your fault."

## DISCUSSION

We discuss Issues One and Two together. In Issue One, Appellant asserts that the trial court erred in denying Appellant's request that the jury be instructed on the lesser-included offenses of murder and felony murder. In Issue Two, Appellant asserts that the trial court erred in denying Appellant's request that the jury be instructed on the lesser-included offense of injury to a child causing death.

The State addresses Issues One and Two together and replies that the trial court did not err in refusing Appellant's request to instruct the jury because (1) there was no evidence that if Appellant was guilty, he was guilty only of a lesser-included offense of capital murder; and (2) before an instruction on a lesser-included offense is warranted, there must be more than a scintilla of evidence that supports the lesser-included offense(s) and in this case there was no such evidence.

*Standard of Review*

We apply a two-step analysis to determine whether an appellant was entitled to a lesser-included offense instruction. *Rousseau v. State*, 855 S.W.2d 666, 672-73 (Tex.Crim.App.),

4

*cert. denied*, 510 U.S. 919, 114 S.Ct. 313, 126 L.Ed.2d 260 (1993); *Hall v. State*, 225 S.W.3d 524, 528 (Tex.Crim.App. 2007). First, the lesser offense must come within article 37.09 of the Code of Criminal Procedure. TEX. CODE CRIM. PROC. ANN. art. 37.09 (West 2006); *Moore v. State*, 969 S.W.2d 4, 8 (Tex.Crim.App.1998). Article 37.09 states in pertinent part, "An offense is a lesser included offense if . . . it is established by proof of the same or less than all the facts required to establish the commission of the offense charged[.]" TEX. CODE CRIM. PROC. ANN. art. 37.09(1)(West 2006); *see also Hall*, 225 S.W.3d at 536. This inquiry is a question of law. *Hall*, 225 S.W.3d at 535. Whether a jury instruction must be given on a lesser offense does not depend on the evidence to be produced at the trial, but is determined by comparing the elements of the offense, as they are alleged in the indictment or information, with the elements of the potential lesser-included offense. *Id.* at 535-36.

Second, some evidence must exist in the record that would permit a jury to rationally find that if the appellant is guilty, he is guilty only of the lesser offense. *Hall*, 225 S.W.3d at 536; *Rousseau*, 855 S.W.2d at 672-73; *Salinas v. State*, 163 S.W.3d 734, 741 (Tex.Crim.App. 2005). The evidence must be evaluated in the context of the entire record. *Moore*, 969 S.W.2d at 8. There must be some evidence from which a rational jury could acquit the appellant of the greater offense while convicting him of the lesser-included offense. *Id.* The court may not consider whether the evidence is credible, controverted, or conflicts with other evidence. *Id.* Anything more than a scintilla of evidence may entitle a defendant to a charge on a lesser offense. *Hall*, 225 S.W.3d at 536.

*Analysis*

Appellant was charged with capital murder for intentionally or knowingly causing the

5

death of an individual under six years of age. The Appellant was convicted "as alleged in the indictment."

A person commits the offense of injury to a child if he intentionally, knowingly, recklessly, or with criminal negligence, or by act or omission, causes serious bodily injury to a child. TEX. PENAL CODE ANN. § 22.04(a)(1)(West 2011). Appellant argues that the totality of the evidence and the testimony of Dr. Carter and Dr. Krouse support his request for instructions on the lesser-included offenses. We disagree.

Dr. Krouse, a physician and Deputy Chief Medical Examiner in the district courts in Fort Worth, testified that he was experienced in performing medical and legal death investigations. Dr. Krouse had performed an autopsy on Trebien Prince and testified that Trebien's death was a homicide, based upon the number and the severity of his injuries. Based on the autopsy evidence, Dr. Krouse testified that Trebien's injuries had been inflicted with the intent to grievously injure or to kill the child. Injuries on the right side of Trebien's face were consistent with someone standing on his neck. Trebien's laceration injuries were consistent with his being repeatedly struck with a claw hammer and a gun. Dr. Krouse explained that Trebien's death was the result of "massive blunt force trauma to the head" consistent with being hit repeatedly with a gun and a hammer. Dr. Krouse's testimony fails to support Appellant's request for a jury instruction on the lesser-included offenses of murder and injury to a child.

Furthermore, beating the 23-month old child in the head with a gun and a claw hammer were acts done with Appellant's knowledge and intent that such injuries would kill the child. *See Salinas*, 163 S.W.3d at 742. The jury may infer the defendant's intent from his use of a deadly weapon in a deadly manner and such inference is almost conclusive. *See Adanandus v. State*, 866

S.W.2d 210, 215 (Tex.Crim.App. 1993), *citing Godsey v. State*, 719 S.W.2d 578 580-81 (Tex.Crim.App. 1986). Because there was no evidence that Appellant intended to cause Trebien only serious bodily injury and not death when he beat the child in the head with a gun and a claw hammer, the trial court did not err in denying an instruction on a lesser-included offense.

Defense expert Dr. Carter's testimony also did not support a charge on a lesser-included offense. Dr. Carter testified that Appellant fell into an emotional state and was not acting rationally. He said, however, that a person can be irrational and still know the difference between right and wrong. In Dr. Carter's opinion, Appellant was also doing things that a calculating person would do and explained that Appellant knew where to hit, and knew if you lose one weapon you can go get another. Dr. Carter said that a person knows the consequences of his conduct when he knows that his conduct is reasonably certain to cause the result, and if you keep hitting a child in the head with a claw hammer, you know the result is significant harm if not death. He further posited, "If you have a hammer and you use the claw end on a small child's skull and it penetrates the skull, you know what the result is going to be, do you not?" Dr. Carter's opinion was that even if Appellant was upset, he knew that he was mortally wounding Trebien. Dr. Carter's expert testimony thus did not support Appellant's request for a lesser-included offense instruction to the jury.

The trial court is required to give the jury a written charge that distinctly sets forth the law applicable to the case. TEX.CODE CRIM. PROC. ANN. art. 36.14 (West 2007). Because the evidence showed that Appellant acted intentionally or knowingly as to the result of his actions, and there was no evidence that raised the issue of a lesser-included offense, the charge on capital murder correctly set forth the applicable law of the case. *Id*. Even if Appellant was upset and in

7

a rage, the evidence shows Appellant knew that death would be the result of beating the 23-month old child in the head with a gun and a claw hammer; therefore, there was no evidence to support a finding that if Appellant was guilty, he was guilty only of a lesser offense. We conclude that the trial judge did not err in denying Appellant's request for a jury instruction on the lesser-included offenses requested. Issues One and Two are overruled.

In Issue Three, Appellant complains that the trial court erred in denying his amended motion for a new trial in which he objected to the distribution of forms given to the venire panel as permitted by Section 61.003 of the Texas Government Code. Appellant first raised this issue in his Amended Motion For New Trial.

The State replies that the trial court did not abuse its discretion in the denying the motion for new trial because Appellant's Amended Motion for New Trial did not preserve error if any.

*Standard of Review*

The trial court's ruling denying a defendant's motion for new trial is reviewed under an abuse of discretion standard. *Fairley v. State*, 90 S.W.3d 903, 905-06 (Tex.App.—San Antonio 2002, no pet.), *citing Salazar v. State*, 38 S.W.3d 141, 148 (Tex.Crim.App. 2001). We do not substitute our judgment for that of the trial court, but simply determine whether the trial court's analysis was arbitrary or unreasonable. *Salazar*, 38 S.W.3d at 148. A trial judge abuses his discretion in denying a motion for new trial when no reasonable view of the record could support his ruling. *Colyer v. State*, 428 S.W.3d 117, 122 (Tex.Crim.App. 2014)(citation omitted). We view the evidence in the light most favorable to the trial judge's ruling and presume that all reasonable factual findings that could have been made against the losing party were made against that losing party. *Id*.

8

*Applicable Law*

Section 61.003(a) of the Texas Government Code states in pertinent part that each person who reports for jury service shall be personally provided a form letter that when signed by the person directs the county treasurer to donate all, or a specific amount designated by the person, of the person's daily reimbursement under this chapter to one of four named charitable funds. TEX. GOV'T CODE ANN § 61.003(a)(West 2013).

*Analysis*

On July 27, 2012, Appellant filed "Defendant's First Amended Motion For New Trial" in which he claims that the Wichita County District Clerk's distribution of forms soliciting contribution of jury service fees from venire members without Appellant's attorney present violated Appellant's Sixth Amendment right to an attorney at voir dire, that the practice created or tended to create a bias or prejudice against Appellant in the minds of the venire, and denied him an impartial jury.

On August 31, 2012, the trial court conducted a hearing on Appellant's motion. The District Clerk testified that the donation forms are given after the prospective jurors are determined to be qualified to sit as jurors. At that time, the venire members have not yet been informed what case they will be hearing. Two-thirds of Appellant's jury donated their fees to the Child Welfare Board. Jurors also have the opportunity to donate their fees to the Crime Victim's Compensation Fund. There was no evidence of whether the donations were made before or after the trial. The trial judge overruled Defendant's First Amended Motion For New Trial.

On appeal, Appellant's defense counsel states that at the time of voir dire he was unaware of the Section 61.003 solicitation practice that occurs outside his and an accused's presence and

9

before the empaneling of the jury venire and voir dire. Defense counsel asserted that he was therefore deprived of the opportunity to intelligently exercise potential challenges for the implied bias shown by jurors' donations. The record shows, however, that defense counsel questioned the venire extensively during voir dire regarding their ability to render an unbiased opinion if the evidence involved the death of a child.

A defendant is entitled to a jury that is unbiased on the question of his guilt; however, the issue of whether he committed the offense is distinct from the issue of whether the crime itself arouses their moral passion. *Ruckman v. State*, 109 S.W.3d 524, 528 (Tex.App.—Tyler 2000, pet. ref'd), *citing United States v. Johnson*, 990 F.2d 1129, 1133 (9th Cir. 1993). Appellant cannot demand a jury that is impartial to the crime itself. *Ruckman*, 109 S.W.3d at 528. There is no evidence that the jurors who donated fees to the Child Welfare Fund were unable to fairly decide whether Appellant committed the offense.

Because we conclude the trial court did not abuse its discretion, Appellant's Issue Three is overruled.

## CONCLUSION

The trial court's judgment is affirmed.


                                        YVONNE T. RODRIGUEZ, Justice
October 17, 2014

Before McClure, C.J., Rivera, and Rodriguez, JJ.
Rivera, J., not participating

(Do Not Publish)

10